**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**CHRIS M. TEAGLE**
Muncie, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J.T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana

FILED

Apr 10 2014, 9:20 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MONTERIUS D. SHARP, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 05A02-1306-CR-522 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE BLACKFORD CIRCUIT COURT
The Honorable Dean A. Young, Judge
Cause No. 05C01-1208-FC-285

**April 10, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

Monterius Sharp appeals his convictions for class C felony escape, class A misdemeanor carrying a handgun without a license, and three counts of class D felony intimidation, following a jury trial. Sharp also appeals the aggregate four-year sentence imposed by the trial court. Sharp claims that: (1) the trial court abused its discretion when it admitted certain evidence at trial; (2) the trial court committed fundamental error when it failed to declare a mistrial sua sponte based upon the improper behavior of a witness; (3) the State presented insufficient evidence to support his convictions; and (4) his four-year sentence is inappropriate in light of the nature of the offenses and his character. Finding neither an abuse of discretion nor reversible error, and further concluding that Sharp has not met his burden to demonstrate that his sentence is inappropriate, we affirm.

**Facts and Procedural History**

The facts most favorable to the convictions indicate that on August 12, 2012, Sharp, his girlfriend Brittani Kirk, his brother Mauricio, and his other brother Courtney's fiancée, Jennifer Townsend, were all at the apartment complex in Hartford City where Townsend and Courtney lived. Neighbors heard the four individuals outside arguing and yelling. Heidi Mort was taking out garbage when she observed the group and saw Sharp standing next to a vehicle and waving a handgun around. All of a sudden, Sharp started firing the weapon. Mort went inside to call 911. Another neighbor, Richard Brown, was outside with his grandchildren when he heard gunshots. Brown also saw the four individuals arguing. Brown, who knew Mauricio, noticed that Mauricio was on a cell phone while a different

2

male in the group was holding a gun. Brown went inside to retrieve a cell phone to call police. While still arguing with the group, Mauricio also called 911.

When Mort returned outside with her husband, she and her husband saw Sharp go around the corner of one of the apartment buildings. Brown also saw the man holding the gun go behind the buildings. When Sharp returned from behind the buildings, he was no longer holding the gun.

Hartford City Police Department Officer Mark McKissack was the first officer to arrive at the scene in response to a dispatch identifying two of the Sharp brothers as being involved in a domestic disturbance or altercation and a report that shots had been fired. Upon his arrival, Officer McKissack recognized all four individuals involved in the reported disturbance. Officer McKissack retrieved a rifle from his trunk and ordered the four individuals to get to the ground on their stomachs. Mauricio, Townsend, and Kirk all complied, but Sharp refused. Sharp remained standing and yelled at Officer McKissack. Sharp eventually sat on the ground. Both Mauricio and Townsend declared that it was Sharp who had the gun. After repeated orders from Officer McKissack, Sharp finally rolled over to his stomach. Officer McKissack then handcuffed Sharp and conducted a patdown search for weapons. No weapon was discovered.

As Officer McKissack was handcuffing Sharp, Hartford City Police Sergeant Erick Hawk arrived at the scene. Sergeant Hawk also recognized all four individuals involved in the disturbance. Mauricio stated to Sergeant Hawk that he had called 911 and that Sharp was the individual with a gun. All four individuals continued to scream and yell at each other

3

and at the officers. As Sergeant Hawk tried to speak with the others, Officer McKissack escorted Sharp to his police vehicle and placed him in the back seat. The window was cracked open, and Sharp screamed and yelled at Mort that "she would be sorry" for calling the police. Tr. at 83-84. Officer McKissack urged Sharp to calm down and told him that "he wasn't under arrest yet." *Id.* Officer McKissack told Sharp to just "sit tight" and that "[r]ight now you're being detained for our investigation." *Id*. at 271. After speaking briefly with witnesses who corroborated that Sharp had been firing a gun, Officer McKissack returned to the police vehicle, read Sharp his *Miranda* rights, and asked him where he had put the gun. Sharp responded that there was no gun and then stated that he wanted to talk to an attorney. Officer McKissack ceased his conversation with Sharp and walked away to resume the investigation.

Shortly thereafter, the officers looked up when they heard the horn of a passing vehicle and noticed that Sharp had exited the police vehicle and was running down the street in handcuffs. Sergeant Hawk chased Sharp and was able to catch him when Sharp's pants fell down around his ankles. Sharp was belligerent as he was being returned to the police vehicle, telling the officers that they didn't know "who they were f***ing with." *Id*. at 280. As Officer McKissack transported Sharp to jail, Sharp continued to yell, scream, kick, and make threats. Townsend gave officers five shell casings that she found at the scene that she believed came from Sharp's gun. Officers located a sixth shell casing behind the apartment buildings. Despite continued searching, officers were unable to locate the gun fired by Sharp.

The State charged Sharp with: Count I, class C felony criminal recklessness; Count II, class C felony escape; Count III, class A misdemeanor carrying a handgun without a license; Count IV, class D felony pointing a firearm; Count V, class D felony intimidation; Count VI, class D felony intimidation; Count VII, class D felony intimidation; and Count VIII, class D felony intimidation. Sharp filed a motion to suppress evidence and, following a hearing, the trial court denied the motion. Sharp filed a second motion to suppress evidence which the trial court also denied following a hearing. The State subsequently filed a motion to dismiss one of the intimidation counts, which motion the trial court granted.

A jury trial was held on February 5 and 6, 2013. Following the State's presentation of evidence, the trial court entered a directed verdict on Count I. At the conclusion of the trial, the jury found Sharp guilty of Counts II, III, V, VI, and VII and not guilty of Count IV. The trial court entered judgments of conviction accordingly. Following a sentencing hearing, the trial court sentenced Sharp to the advisory sentence on all counts, to be served concurrently, for a total sentence of four years. This appeal ensued.

**Discussion and Decision**

**Section 1 – Admission of Evidence**

Sharp contends that the trial court erred when it denied his pretrial motions to suppress evidence. However, we note that he now appeals following a jury trial. Therefore, the issue before us is whether the trial court abused its discretion in admitting the evidence at trial. *Lindsey v. State*, 916 N.E.2d 230, 238 (Ind. Ct. App. 2009), *trans. denied* (2010). A trial court has broad discretion in ruling on the admission or exclusion of evidence. *Palilonis*

*v. State*, 970 N.E.2d 713, 726 (Ind. Ct. App. 2012), *trans. denied*. An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented. *Id*. When reviewing the admissibility of evidence, we do not reweigh evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Meredith v. State*, 906 N.E.2d 867, 869 (Ind. 2009). We also defer to the trial court's factual determinations unless clearly erroneous. *Id*. However, we consider "afresh any legal question of the constitutionality of a search or seizure." *Id*.

### Section 1.1 – Stop vs. Arrest

Sharp first asserts that he was "illegally detained" by officers in violation of the Fourth Amendment to the United States Constitution and that all evidence obtained subsequent to his illegal detention was inadmissible. Appellant's Br. at 16. Sharp likens his detention by officers to an arrest requiring probable cause, while the State argues that his detention was more akin to a brief investigative stop requiring only reasonable suspicion. Regardless of how the detention is characterized, we find no Fourth Amendment violation.[1]

The Fourth Amendment reads in part: "The right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated[.]" This protection against unreasonable seizures includes seizure of the person.

---

[1] Although Sharp briefly mentions Article 1, Section 11 of the Indiana Constitution, his argument fails to adequately address the three factors that we balance to determine the reasonableness of a search or seizure under our state constitution. *See Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005) (in determining reasonableness of search or seizure we balance: (1) the degree of concern, suspicion, or knowledge that a violation has occurred; (2) the degree of intrusion the method of the seizure imposed on the citizen's ordinary activities; and (3) the extent of law enforcement needs). Failure to make a cogent argument pursuant to Article 1, Section 11, constitutes waiver of the issue on appeal. *Polk v. State*, 822 N.E.2d 239, 245 n.5 (Ind. Ct. App. 2005), *trans. denied*; Ind. Appellate Rule 46(A)(8).

*California v. Hodari D.*, 499 U.S. 621, 624-26 (1991). Specifically, there are two levels of police investigation that implicate the Fourth Amendment. *Edmond v. State*, 951 N.E.2d 585, 588 (Ind. Ct. App. 2011). First, an officer may stop and briefly detain "a person for investigative purposes if the officer has reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *Armfield v. State*, 918 N.E.2d 316, 319 (Ind. 2009) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). An investigatory stop pursuant to *Terry* permits a police officer to "temporarily freeze the situation in order to make an investigative inquiry." *Johnson v. State*, 766 N.E.2d 426, 429 (Ind. Ct. App. 2002), *trans. denied*. Second, an officer may arrest a person if he has probable cause, which is "knowledge of facts and circumstances which would warrant a man of reasonable caution to believe that the defendant committed the criminal act in question." *Collins v. State*, 509 N.E.2d 827, 830 (Ind. 1987). As our supreme court recently noted, "[t]he line between a *Terry* stop and a full-blown custodial arrest is blurred by the tensions and uncertainty inherent in such encounters." *Kelly v. State*, 997 N.E.2d 1045, 1051 (Ind. 2013).

Here, Officer McKissack was the first officer to arrive on the scene in response to a dispatch specifically identifying the Sharp brothers as involved in a domestic disturbance and a report that several gunshots had been fired. Officer McKissack arrived at the scene, displayed a rifle, and ordered all four individuals present to get to the ground on their stomachs. Officer McKissack was familiar with the four individuals, including Sharp and Mauricio, as he had been dispatched to the apartment complex on prior occasions regarding domestic disturbances and/or altercations involving the same individuals. All of the

7

individuals complied with Officer McKissack's order to get on the ground except Sharp. Officer McKissack again ordered Sharp to comply. Although Sharp then sat on the ground, he refused to comply with commands to get on his stomach. After repeated commands, Sharp eventually rolled over to his stomach. When Sergeant Hawk arrived to aid Officer McKissack, the scene was extremely volatile, as all four individuals were screaming and yelling at each other and at the officers. After Mauricio and another witness identified Sharp as the individual who had the gun and had fired the shots, Officer McKissack handcuffed Sharp and patted him down for weapons. Although his patdown search did not reveal a weapon, Officer McKissack placed Sharp in the back seat of his police vehicle while he further investigated the incident.

It is beyond dispute that "an officer who stops a suspect on reasonable suspicion of [an inherently dangerous] offense may conduct a protective search." *Holbert v. State*, 996 N.E.2d 396, 400 (Ind. Ct. App. 2013), *trans. denied* (2014). Indeed, "[t]his right of the officer is 'automatic whenever the suspect has been stopped upon the suspicion that he has committed, was committing, or was about to commit a type of crime for which the offender would likely be armed." *Id*. (citation omitted). Sharp concedes that Officer McKissack had reasonable suspicion to justify the initial stop and protective search for weapons based upon the fact that he was responding to reports of gunfire. Sharp insists, however, that Officer McKissack's subsequent behavior converted what began as a *Terry* stop into an arrest because he handcuffed Sharp and placed him in the police vehicle.

Although both an arrest and a *Terry* investigatory stop interrupt a suspect's freedom and liberty of movement, a *Terry* interruption is presumably much less intrusive and for a shorter duration than an arrest. *Reinhart v. State*, 930 N.E.2d 42, 46 (Ind. Ct. App. 2010). Specifically, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Finger v. State*, 799 N.E.2d 528, 534 (Ind. 2003) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

Contrary to Sharp's implication, the mere use of handcuffs does not convert a *Terry* stop into a full arrest. *See Wright v. State*, 766 N.E.2d 1223, 1232 (Ind. Ct. App. 2002). Moreover, placing a defendant in a police vehicle does not necessarily equate to an arrest when the police action can be justified as the "least restrictive means available" for effecting the investigation. *See Berry v. State*, 574 N.E.2d 960, 965 (Ind. Ct. App. 1991) (citation omitted), *trans. denied*. Instead, we must examine the totality of the circumstances to determine how to classify the officer's actions. *Reinhart*, 930 N.E.2d at 46.

The facts here establish that Officer McKissack's detention of Sharp did not last too long and was justified in order for officers to complete their investigation and confirm or dispel their suspicions quickly, while also ensuring officer and civilian safety. The record indicates that the two officers on the scene were faced with an incredibly dangerous and

9

volatile situation. Sharp was belligerent and uncooperative with Officer McKissack's commands, and he was identified by his brother and another witness as just having fired a gun. The four individuals involved in the disturbance, including Sharp, were screaming and yelling at each other and at the officers. The officers knew that there was a weapon, but had not yet located it. Under these circumstances, Officer McKissack's action of handcuffing Sharp and temporarily removing him from the group by placing him in the squad car was necessary in order to calm the environment and permit the officers to further investigate. Sharp's detention constituted an investigatory stop supported by reasonable suspicion and was not an arrest.

Even were we to conclude, as Sharp insists, that his detention was converted into an arrest when Officer McKissack handcuffed him and placed him into the squad car, we would still find no Fourth Amendment violation. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been or is being committed. *State v. Gilbert*, 997 N.E.2d 414, 417 (Ind. Ct. App. 2013) (citation omitted). The facts stated above, which were known to the officers at the time, were sufficient in themselves to warrant a person of reasonable caution to believe that Sharp had committed a crime. Sharp was involved in a domestic dispute during which shots were fired,

10

Sharp was uncooperative with police on the scene, and two of the individuals involved in the dispute identified Sharp as the shooter. Based upon these facts, Officer McKissack had probable cause to arrest Sharp. We find no Fourth Amendment violation. Accordingly, Sharp has not demonstrated that the trial court abused its discretion when it admitted evidence obtained after his detention.[2]

### Section 1.2 – *Miranda* Warning and Right to Counsel

Sharp also contends that the trial court abused its discretion when it admitted into evidence State's Exhibit 9, which consisted of a statement made by him to police the day after the incident occurred for which he was arrested.[3] He argues that his statement was admitted in violation of his *Miranda* rights under the Fifth Amendment to the United States Constitution.

"The Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior [*Miranda*] warning." *Ritchie v. State*, 875 N.E.2d 706, 716 (Ind. 2007). "When a subject is in custody, *Miranda* requires that he be informed of the right to the presence and advice of counsel during custodial interrogation by the police, of the right to remain silent, and that any

---

[2] We note that Sharp does not challenge the admission of any evidence obtained on his person or incident to his eventual arrest, as no such evidence was recovered. Instead, he appears to challenge the admission of any evidence recovered at the scene, which included only witness statements and six shell casings, as fruit of the poisonous tree. *See Clark v. State*, 994 N.E.2d 252, 266 (Ind. 2013) (as general rule, evidence obtained pursuant to unlawful seizure must be excluded under the fruit of the poisonous tree doctrine). Because Sharp's detention was lawful, the fruit of the poisonous tree doctrine is inapplicable.

[3] Although Sharp also references the officers' testimony regarding statements he made on the day of the incident, he did not object to that testimony during trial. Accordingly, the issue is waived. *See Kubsch v. State*, 784 N.E.2d 905, 923 (Ind. 2003) (failure to object at trial to admission of evidence results in waiver of that issue on appeal).

statement he makes may be used as evidence against him." *Collins v. State*, 873 N.E.2d 149, 155 (Ind. Ct. App. 2007). Moreover, if the accused requests counsel, the police must cease questioning until an attorney has been made available or until the accused initiates further conversation with the police. *Sauerheber v. State*, 698 N.E.2d 796, 801 (Ind. 1998) (citing *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)). If the accused "initiates 'further communication, exchanges, or conversations' with law enforcement, then the individual may be further interrogated without counsel present." *Hartman v. State*, 988 N.E.2d 785, 788 (Ind. 2013) (quoting *Edwards*, 451 U.S. at 484-85).

First, contrary to Sharp's assertion that he was not given *Miranda* warnings at any time, Officer McKissack testified that he gave Sharp a *Miranda* warning on the day of the incident when Sharp was in the back seat of the police vehicle. Indeed, during the hearing on Sharp's second motion to suppress, the parties stipulated that Sharp had been advised of his *Miranda* rights and that, in response to Officer McKissack's questioning regarding the location of the gun, Sharp invoked his right to remain silent and requested an attorney. Officer McKissack honored Sharp's request and immediately ceased any questioning.

The evening after the incident, Officer McKissack and Sergeant Hawk responded to a call to transport Sharp, who had gone to the hospital at some point after his arrest, from the hospital back to the Blackford County Security Center. When the officers arrived at the hospital and encountered Sharp, Sharp initiated an exchange with the officers by immediately asking them, "How did you get probable cause?" State's Ex. 9. Officer McKissack restated the question to Sharp, apparently to determine if Sharp truly wanted a response. When Sharp

12

asked the question again, Officer McKissack responded that he went before a judge with the evidence and that a judge signed the probable cause affidavit and set bond. Sharp then exchanged questions and answers with the officers. During the conversation, the officers asked Sharp where they might be able to find the handgun he had used during the incident. Sharp referenced a few locations where a handgun might be found but essentially denied committing any crimes.

It is clear from our review of State's Exhibit 9 that Sharp, and not the officers, initiated conversation when he began asking the officers specific questions about his case. However, the initiation of further communication by a defendant, standing alone, is insufficient to establish waiver of the previously asserted right to counsel. *Osborne v. State*, 754 N.E.2d 916, 922 (Ind. 2001). The inquiry turns on whether, under the totality of the circumstances, there is a knowing and intelligent waiver of the right to counsel. *Storey v. State*, 830 N.E.2d 1011, 1018 (Ind. Ct. App. 2005). This inquiry requires a review of the record for evidence of inducement by the way of violence, threats, promises, or other improper influences. *Id*.

Under the facts as presented here, we need not even reach such an inquiry. Significantly, Sharp fails to direct us to any information regarding his offenses, inculpatory or exculpatory, that he revealed during his initiated exchange with the officers. Moreover, it is well settled that not every error in the admission of evidence requires reversal. *Carr v. State*, 934 N.E.2d 1096, 1107 (Ind. 2010). Statements obtained in violation of the federal constitution and improperly admitted are subject to harmless error analysis. *Anderson v.*

13

*State*, 961 N.E.2d 19, 28 (Ind. Ct. App. 2012), *trans. denied*. The reviewing court must be satisfied that the error did not contribute to the verdict, that is, that the error was unimportant in relation to everything else the jury considered on the issue in question. *Morales v. State*, 749 N.E.2d 1260, 1267 (Ind. Ct. App. 2001).

Sharp's convictions are supported by substantial independent evidence of guilt such that there was no substantial likelihood that his statements to police the day after his arrest contributed to his convictions. First, Sharp's statement bore no relation to his convictions for escape or intimidation. Regarding his conviction for carrying a handgun without a license, the lion's share of the State's evidence came from numerous witnesses who identified Sharp as the individual who both possessed and fired a gun during the domestic disturbance. Accordingly, any error in the admission of Sharp's statement would have been harmless, as it was unimportant in relation to the other evidence considered by the jury.

### Section 2 – Witness's Improper Behavior

Sharp next claims that one of the State's key witnesses, his brother Mauricio, "interrupted the proceedings" to such an extent that Sharp was entitled to a mistrial. Appellant's Br. at 28. The record indicates that Mauricio walked into the courtroom during opening statements, and the trial court ordered him to leave. Thereafter, during defense counsel's cross-examination of Townsend, the court paused briefly for a bench discussion, noting that Mauricio had "been at every single window and walking around and I hear talking." Tr. at 43. The court instructed an officer, "Can you get him back in that conference room, shut the door and assign some officer to stay with him? He's not to leave that room or

14

do anything until he's brought in here." *Id.* Finally, at the outset of his own testimony, Mauricio attempted to answer a cell phone call and was behaving strangely. The trial court dismissed the jury and, after a bizarre and comical exchange between Mauricio, the trial court, and counsel for both parties, the court instructed Mauricio to behave appropriately and complete his testimony. After the jury returned, Mauricio testified very briefly and was released. [4]

Sharp admits that he did not request a jury admonishment or move for a mistrial based upon Mauricio's behavior, and therefore has waived the issue on appeal. *See Berkman v. State*, 976 N.E.2d 68, 74 (Ind. Ct. App. 2012) (when faced with a circumstance that defendant believes might warrant mistrial, correct procedure is to request admonishment, and if admonishment will not be sufficient to cure error, then move for mistrial; failure to request admonishment or move for mistrial results in waiver on appeal), *trans. denied* (2013), *cert. denied*. Thus, Sharp relies on the fundamental error doctrine. The fundamental error doctrine is extremely narrow and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. *Delarosa v. State*, 938 N.E.2d 690, 694 (Ind. 2010). The fundamental error exception is available only in egregious circumstances. *Id.* Indeed, "[f]undamental error must be of such magnitude to persuade the reviewing court that the defendant could not possibly have received a fair trial or that the verdict is clearly wrong or of such dubious validity that justice cannot permit it to stand." *Brown v. State*, 799 N.E.2d

---

[4] It appears that the State used Mauricio's testimony solely to introduce his 911 call into evidence.

1064, 1067 n.3 (Ind. 2003) (quoting *Guy v. State*, 755 N.E.2d 248, 258 (Ind. Ct. App. 2001), *trans. denied*, (2002)).

We disagree with Sharp's assertion that, under the circumstances presented, the trial court should have declared a mistrial sua sponte and that its failure to do so constituted fundamental error. While Mauricio's conduct during the proceedings was at times unbefitting and disruptive, Sharp has failed to demonstrate that Mauricio's conduct resulted in an unfair trial. As noted by the State, Mauricio's antics were treated reasonably and appropriately by the trial court, which minimized any potential for harm. Mauricio's behavior and the trial court's response to that behavior certainly did not rise to the level of egregious circumstances contemplated by the fundamental error doctrine.[5] We find no reversible error.

### Section 3 – Sufficiency of the Evidence

Sharp asserts that the State presented insufficient evidence to sustain his convictions for escape, carrying a handgun without a license, and intimidation. When reviewing the sufficiency of the evidence, we consider only the probative evidence and reasonable inferences supporting the verdict. *Boggs v. State*, 928 N.E.2d 855, 864 (Ind. Ct. App. 2010), *trans. denied*. We neither reweigh the evidence nor assess witness credibility. *Id.* It is not

---

[5] Sharp maintains that Mauricio violated the trial court's separation of witnesses order because one of his interruptions occurred during Townsend's testimony. Our review of the record does not reveal that Mauricio heard any of Townsend's testimony or that he was influenced by that testimony. *See Harrington v. State*, 584 N.E.2d 558, 562 (Ind. 1992) ("The primary purpose for separation of witnesses is to prevent them from gaining knowledge from the testimony of other witnesses and adjusting their testimony accordingly."). Even assuming arguendo that Mauricio improperly heard or gained knowledge from Townsend's testimony, as stated above, Sharp has failed to demonstrate that he was deprived of a fair trial as a result.

necessary that the evidence overcome every reasonable hypothesis of innocence, and we will affirm the defendant's conviction unless no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt. *Id*. If there is substantial evidence of probative value to support the conviction, it will not be set aside. *Jones v. State*, 783 N.E.2d 1132, 1139 (Ind. 2003).

### Section 3.1 – Escape

Indiana Code Section 35-44.1-3-4(a) provides in relevant part that a person "who intentionally flees from lawful detention commits escape, a Class C felony." Sharp concedes that the evidence demonstrated that he intentionally fled from law enforcement. His sole argument is that his detention was in violation of the Fourth Amendment, and therefore the State failed to establish that his detention was lawful. "Lawful detention" includes an "arrest" as well as "any other detention for law enforcement purposes." Ind. Code § 35-41-1-18. Here, Sharp was clearly detained by officers for law enforcement purposes as they briefly investigated the scene of a domestic disturbance involving gunfire and in which Sharp had been identified as the shooter. As we concluded in Section 1, Sharp's detention was not in violation of the Fourth Amendment because his detention was supported by both reasonable suspicion and probable cause. Accordingly, his detention was lawful. The State presented sufficient evidence to support Sharp's conviction for escape.

### Section 3.2 – Carrying a Handgun Without a License

Indiana Code Section 35-47-2-1 provides that "a person shall not carry a handgun in any vehicle or on or about the person's body without being licensed … to carry a handgun."

A person who violates this section commits a class A misdemeanor. Ind. Code § 35-47-2-23(c). Sharp acknowledges that he did not have a license to carry a handgun. He maintains, however, that the officers never recovered the weapon, and thus the State failed to prove that he carried a handgun on his person.

A conviction for carrying a handgun without a license may rest on proof of actual or constructive possession. *Person v. State*, 764 N.E.2d 743, 750 (Ind. Ct. App. 2002), *trans. denied*. Witness Heidi Mort testified that, on the day of the domestic disturbance, she saw several individuals arguing and Sharp "waving a gun around." Tr. at 78. She stated that Sharp then put his hand up and "started shooting" the "medium-sized pistol." *Id*. at 78, 81. Additionally, two of the individuals involved in the disturbance, Mauricio and Townsend, informed officers that Sharp had a gun and had been firing it. Despite direct testimony establishing his actual possession of a handgun, Sharp challenges witness credibility and asks that we reassess it in his favor. Such a task is not within our prerogative on appeal. *See Boggs*, 928 N.E.2d at 864. The State presented sufficient evidence to sustain Sharp's conviction for carrying a handgun without a license.

### Section 3.3 – Intimidation of Officer McKissack and Sergeant Hawk[6]

To convict Sharp of two counts of class D felony intimidation regarding Officer McKissack and Sergeant Hawk, the State was required to prove that Sharp communicated threats to Officer McKissack and Sergeant Hawk that placed them in fear of retaliation for a

---

[6] Sharp was also convicted of the intimidation of witness Heidi Mort. Although he claims that the State also presented insufficient evidence to sustain that conviction, he fails to mention any evidence or develop any argument regarding that conviction. Consequently, he has waived our review of the issue. *Whaley v. State*, 843 N.E.2d 1, 18 n.15 (Ind. Ct. App. 2006), *trans. denied*.

prior lawful act. *See* Ind. Code § 35-45-2-1(a)(2). "Whether a communication is a threat is an objective question for the trier of fact." *Ajabu v. State*, 677 N.E.2d 1035, 1041 (Ind. Ct. App. 1997), *trans. denied*.

Officer McKissack testified that as he and Sergeant Hawk were trying to get Sharp back into the police vehicle after his escape, Sharp told the officers that "we didn't know who we were f***ing with." Tr. at 280. While being transported to jail, Sharp told Officer McKissack that he knew where both Officer McKissack and Sergeant Hawk lived. He stated that he knew Sergeant Hawk's wife by name and that "he knew people in Chicago and that [the officers] didn't know who we were screwing with." *Id*. at 281. Sharp does not dispute this testimony and merely asserts that the scene of the domestic disturbance was "chaotic" and that it is unlikely that he could have clearly communicated any threats to the officers. Again, Sharp merely invites us to reweigh the evidence, which we will not do. *See Boggs*, 928 N.E.2d at 864. The State presented sufficient evidence for the jury to find Sharp guilty of the intimidation of Officer McKissack and Sergeant Hawk.

## Section 4 – Inappropriate Sentence

Sharp requests that we reduce his sentence. Pursuant to Indiana Appellate Rule 7(B), we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence "is inappropriate in light of the nature of the offense and the character of the offender." The defendant bears the burden to persuade this Court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). "[W]hether we regard a sentence as appropriate at the end of the day turns on our sense of

culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008).

When considering the nature of the offense, the advisory sentence is the starting point to determine the appropriateness of a sentence. *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218. Sharp was convicted of one class C felony, three class D felonies, and one class A misdemeanor. The highest felony for which Sharp was convicted, class C felony escape, has a sentencing range between two and eight years, with the advisory sentence being four years. Ind. Code § 35-50-2-6. The trial court imposed the advisory sentence for each of his convictions and ordered that his sentences be served concurrently, for a total sentence of four years. Although Sharp points out that no person was injured as a result of his crimes, he fails to explain how imposition of the advisory sentence on each of his crimes was inappropriate based upon the nature of those offenses. He brandished and fired a weapon in a crowded apartment complex, escaped from the police who were summoned to help, and then threatened the officers and one of the witnesses. Sharp has not demonstrated that the nature of these crimes warrants a reduction below the advisory sentence.

Regarding his character, the record reveals that Sharp has two prior misdemeanor convictions, one involving a handgun. While his criminal history is by no means extensive, such history, which includes a prior conviction involving a handgun, does not reflect favorably on his character. *See Richardson v. State*, 906 N.E.2d 241, 248 (Ind. Ct. App.

20

2009) (when reviewing criminal history, among other things, we look to any similarity or dissimilarity to the present offense that might reflect on a defendant's culpability). Sharp's sole argument regarding his character is essentially a request that we reconsider the mitigating weight of his young age, lack of prior felony convictions, and his remorse, and that we determine that the trial court should have imposed the minimum sentence on each count rather than the advisory sentence.

To the extent that Sharp argues that the trial court assigned improper weight to mitigating factors, such a claim is not available for appellate review. *Lamar v. State*, 915 N.E.2d 193, 196 (Ind. Ct. App. 2009). Moreover, we observe that an argument pursuant to Appellate Rule 7(B), as Sharp's argument is framed, involves an analysis distinct from that of a claim that aggravators and mitigators were improperly recognized during sentencing. *King v. State*, 894 N.E.2d 265, 267 (Ind. Ct. App. 2008). Because Sharp frames his argument solely pursuant to Appellate Rule 7(B), we so confine our consideration. We remind him that "the question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate." *Id.* at 268. Sharp has not met his burden to demonstrate that his four-year sentence is inappropriate. His convictions and sentence are affirmed.

Affirmed.

BAKER, J., and NAJAM, J., concur.